CHAZ LAVER MOSEBY,

                         Plaintiff,

        v.                                    **Case No. 15-cv-1096-pp**

JUDY SMITH,
ERIC NORMAN,
LT. R. SMITH,
MICHAEL DITTMAN,
DON MORGAN,
SECURITY DIRECTOR WEBER,
CAPTAIN KELLER,
LT. MORRISON,
SGT. PERKINS,
OFFICER BABCOCK,
JOHN AND JANE DOES #1-10,

                         Defendants.

---

**DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO PROCEED *IN FORMA PAUPERIS* (DKT. NO. 2) AND SCREENING PLAINTIFF'S AMENDED COMPLAINT**

---

The plaintiff, a state prisoner, filed a *pro se* complaint under 42 U.S.C. §1983, alleging that the defendants at the Oshkosh Correctional Institution and the Columbia Correctional Institution violated his civil rights. This order resolves the plaintiff's motion for leave to proceed *in forma pauperis* and screens the plaintiff's complaint.

### I.        *IN FORMA PAUPERIS* STATUS

The Prison Litigation Reform Act ("PLRA") applies to this action because the plaintiff filed his complaint while incarcerated. 28 U.S.C. §1915. The PLRA

1

allows a court to grant an incarcerated plaintiff the ability to proceed with his lawsuit without pre-paying the civil case-filing fee, as long as he meets certain conditions. One of those conditions is a requirement that the plaintiff pay an initial partial filing fee. 28 U.S.C. §1915(b). Once the plaintiff pays the initial partial filing fee, the court may allow the plaintiff to pay the balance of the $350 filing fee over time, through deductions from his prisoner account. Id.

On October 5, 2015, the court assessed an initial partial filing fee of $137.64. Dkt. No. 6. The plaintiff paid that amount on November 3, 2015. Accordingly, the court will grant the plaintiff's motion for leave to proceed *in forma pauperis* and will allow the plaintiff to pay the balance of the $350 filing fee over time from his prisoner account, as described at the end of this order.

## II. SCREENING OF PLAINTIFF'S AMENDED COMPLAINT

### A. Standard for Screening Complaints

The PLRA requires federal courts to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court may dismiss an action or portion thereof if the claims alleged are "frivolous or malicious," fail to state a claim upon which relief may be granted, or seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915(e)(2)(B).

To state a claim under the federal notice pleading system, plaintiffs must provide a "short and plain statement of the claim showing that [he] is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). The complaint need not plead specific facts, and need only provide "fair notice of what the . . . claim is and the grounds

2

upon which it rests." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)). "Labels and conclusions" or a "formulaic recitation of the elements of a cause of action" will not do. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Twombly</u>, 550 U.S. at 555).

The factual content of the complaint must allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id</u>. The factual allegations must "raise a right to relief above the speculative level," and when accepted as true, must state a claim that is "plausible on its face." <u>Twombly</u>, 550 U.S. at 555; <u>Iqbal</u>, 556 U.S. at 678.

Federal courts follow the two-step analysis set forth in <u>Twombly</u> to determine whether a complaint states a claim. <u>Iqbal</u>, 556 U.S. at 679. First, the court determines whether the plaintiff's legal conclusions are supported by factual allegations. <u>Id</u>. Legal conclusions not supported by facts "are not entitled to the assumption of truth." <u>Id</u>. Second, the court determines whether the well-pleaded factual allegations "plausibly give rise to an entitlement to relief." <u>Id</u>. The court gives *pro se* allegations, "however inartfully pleaded," a liberal construction. <u>See</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976)).

In the context of a §1983 claim, the plaintiff must allege that: (1) he was deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was visited upon him by a person or persons acting under the color of state law. <u>Buchanan-Moore v. Cnty. of Milwaukee</u>, 570 F.3d 824, 827 (7th Cir. 2009)(citing <u>Kramer v. Vill. of N. Fond du Lac</u>, 384 F.3d 856,

3

Case 2:15-cv-01096-PP   Filed 06/01/16   Page 3 of 23   Document 7


861 (7th Cir. 2004). A suit seeking monetary damages under §1983 must further allege that the defendants were personally involved in the constitutional deprivation. Matz v. Klotka, 769 F.3d 517, 527 (7th Cir. 2014).

      B.    Facts Alleged in the Proposed Complaint

In October 2012, the plaintiff was an inmate at the Oshkosh Correctional Institution ("OCI"). Dkt. No. 1 at ¶ 8. OCI Lieutenant Eric Norman gave the plaintiff a conduct report, because Norman received information that the plaintiff's fiancée, Marie Enzell, planned to smuggle drugs into the prison during her October 13, 2012 visit with plaintiff. Id. at ¶¶ 8-11. On October 13, 2012, Norman and OCI Lieutenant R. Smith[1] removed the plaintiff from general population and placed him in segregation. Id. at ¶ 12. The officers' investigation, which included reviewing the plaintiff's phone calls, had revealed that the plaintiff's fiancée would be visiting the plaintiff on October 13, 2012. Id. at ¶ 11. Enzell did, in fact, arrive at OCI on that day; OCI staff intercepted her in the lobby and determined that she possessed marijuana and K2. Id. at ¶ 13.

Norman, along with OCI Lieutenant Tony (who is not a defendant in this case), informed the plaintiff that they had detained his fiancée because they found her with drugs. Id. at ¶ 13. The plaintiff alleges that Norman and Lieutenant Smith "used coercive threats of prolonged assignment in the Segregation building at [OCI], prosecution . . . in the Criminal Court of Enzell

---

[1] The court will refer to this defendant as "Lieutenant Smith," to differentiate him from a different defendant, Warden Judy Smith, to whom the court will refer as "Warden Smith."

4

and Moseby and other tactics to convince Moseby to cooperate" in an investigation of drug use and dealing in OCI. Id. at ¶ 14. The plaintiff agreed, and he provided the officers with names of other inmates who were involved in the drug trafficking. Id. at ¶ 15. Norman and Lieutenant Smith did not believe that the plaintiff had been sufficiently forthcoming with the information he provided. Id. at ¶¶ 15-16. The plaintiff alleges that as a result, the officers informed other inmates in segregation that the plaintiff had "cooperated" with prison staff, thereby identifying him as a "snitch." Id.

Shortly thereafter, other inmates in segregation began threatening the plaintiff with physical harm. Id. The plaintiff wrote to OCI Warden Judy Smith, complaining about Norman and Lieutenant Smith and the subsequent threats from other segregation inmates. Id. at ¶ 19. Warden Smith responded that the plaintiff should address the issue with the Disciplinary Hearing Committee. Id.

Several days after Norman and Lieutenant Smith decided that the plaintiff wasn't being forthcoming, the plaintiff was visited in his cell by a social worker. Id. at ¶ 38. The social worker told him that his custody level was going to be increased from medium to maximum. Id. at ¶ 39. On November 16, 2012, the plaintiff appeared before the Program Review Committee ("PRC") for the re-classification hearing. Id. at ¶ 40. Lieutenant Smith was one of the committee members. Id. The plaintiff alleges that Smith gave the PRC coordinator false information about the plaintiff's drug trafficking at two different institutions and his past conduct reports. Id. At the conclusion of the hearing, the PRC decided that the plaintiff's classification should be increased from medium to

5

maximum, and that he should be transferred to Columbia Correctional Institution ("CCI"). Id. at ¶ 45.

The plaintiff alleges that the decision to transfer him to CCI was problematic. He explains that in 2007 (some five years before the events described above), while he was incarcerated at CCI, he was the target of a gang assault, which "resulted in a physical altercation with Michael Alexander, another prisoner, who tried to recruit Moseby, then 22 years old, into a prison gang." Id. at ¶ 42. At that time, the Department of Corrections ("DOC") issued a Special Placement Need ("SPN"), requiring the plaintiff to be kept separate from Alexander, and the DOC transferred the plaintiff to Waupun Correctional Institution. Id. at ¶ 43. The PRC at CCI issued its decision on June 21, 2007, which included the statement that the plaintiff "ha[d] some issues with other inmates here at CCI (would not elaborate)." Id. at ¶ 41.

So—despite the 2007 SPN requiring the plaintiff to be separated from Alexander, the OSCI PRC recommended increasing the plaintiff's custody status from medium to maximum, with a transfer to CCI. Id. at ¶ 45. The PRC assured the plaintiff that Alexander was no longer incarcerated at CCI. Id.

The plaintiff remained in segregation at OCI from his placement there in October 2012 until February 2013. Id. at ¶ 23. The plaintiff alleges that the segregation unit had insufficient insulation and ventilation, and that the inmates housed there were subjected to "extreme fluctuating temperatures." Id. at ¶ 12. The plaintiff also alleges that there were "extremely cold temperatures" in the segregation unit. Id. at ¶ 20. In January 2013, another inmate plugged

6

up the toilet in that inmate's cell, which caused water to overflow the toilet, run out of the cell, and flow into the corridor. Id. at ¶¶ 25-26. The toilet water flowed into the plaintiff's cell; his canvas shoes, socks and pants hems became wet as a result. Id. at ¶ 26. When the plaintiff requested dry clothing, dry shoes, and cleaning materials to sanitize his cell, OCI Correctional Officers Kraft and Borkowski (who are not defendants in this case) denied his request. Id. at ¶ 27. The contaminated water remained in the plaintiff's cell for approximately five hours; even then, third-shift staff put blankets and towels in front of the plaintiff's door to keep water from coming back into the cell. Id. at ¶ 29. Two weeks later, the plaintiff told the Health Services Unit staff that he had developed a fungus under the toenail of his right big toe, which discolored his toenail and caused him pain and irritation for some three months. Id. at ¶ 34.

On January 1, 2013, the plaintiff filed an offender complaint regarding the conditions of his segregation cell. Id. at ¶ 28. OCI complaint examiner Theresa Murphy (who is not a defendant in this case) recommended dismissing the complaint (finding that there wasn't much water and that it was just water, not contaminated water). Id. at ¶ 31. Warden Smith dismissed the complaint eight days later, without conducting an "independent investigation." Id. at ¶ 32.

While he was in the segregation unit at OCI, the plaintiff also sent an "interview information request" to Warden Smith, alleging that the temperature in the segregation unit was "icy" and cold. Id. at ¶ 35. Warden Smith instructed the plaintiff to send the request to the segregation supervisor, but did nothing

herself. Id. The plaintiff alleges that the cold temperatures "often caused numbing, pain and a tingling sensation of [his] fingers and toes, and caused sleeplessness for days at a time." Id. at ¶ 36.

On February 7, 2013, the DOC transferred the plaintiff to CCI. Id. at ¶ 50. Although he'd been assured that Michael Alexander was no longer housed at CCI, the plaintiff saw inmate Alexander and "a number of other prisoners from Alexander's clique," and the "animosity" from 2007 resumed; the plaintiff alleges that it was fueled by rumors that the plaintiff had been an informant at OCI. Id. Over the next nine months, the plaintiff wrote to CCI Warden Michael Dittman's office, CCI Security Director Weber, CCI Captain Don Morgan, CCI Captain Keller, and CCI Lieutenant Mike Morrison, notifying them that in 2007, during his last stint at CCI, he'd been in a fight with Alexander. Id. at ¶ 51. The plaintiff told these individuals that Alexander "was affiliated with" a gang that had tried to recruit him, and that Leshawn Benson, who was considered to be one of the original members of Alexander's gang, had "been issuing threats to [the plaintiff] stemming from the 2007 incident and referring to [the plaintiff] as a 'snitch' stemming from the 2012 incident at [OCI]." Id. at ¶ 52.

In mid-November 2013, the plaintiff wrote a request slip to Morrison, asking to be removed from his current unit "before something happens," because he believed that "hostility [was] becoming more and more immediate." Id. at ¶ 54. About a week later, on November 23, 2013, the PRC at CCI held a hearing, where the plaintiff verbally expressed his concern and asked to be

8

transferred to a different maximum security facility; the PRC decided that there was no need to transfer the plaintiff. Id. at ¶ 55.

On that same day—November 23, 2013—Benson verbally assaulted the plaintiff in the dining room (including calling him a "snitch" for having complained and asking to be moved). Id. at ¶ 56. Benson then stormed off toward his cell. Id. at ¶ 57. CCI Sergeant Perkins, who was assigned to the dining area, witnessed the altercation but did nothing to stop Benson from going toward the plaintiff's cell. Id. CCI Correctional Officer Babcock, who observed the verbal confrontation from the security booth, permitted Benson to go into his cell. Id. at ¶ 58. The plaintiff alleges that Babcock then violated OCI procedures and policies by allowing Benson to come back out of his cell and return to the dayroom. Id. The plaintiff alleges that both Perkins and Babcock saw Benson come out of his cell "with the prisoner's hand beneath his sweatshirt and tucked into the waistband area of the prisoner's pants." Id. at ¶ 61.

When Benson came back out into the dayroom, he shouted obscenities at the plaintiff, put something on the officer's desk, spoke briefly to another prisoner, and then went over to where the plaintiff was sitting. Id. at ¶ 63. The plaintiff stood up, and "subdued Benson in a headlock," which he refused to release until the CCI staff restrained him. Id. at ¶ 64. Before the staff was able to restrain Benson, however, Benson punched the plaintiff in the head and face, and injured the plaintiff's back by slamming him on the table. Id. Perkins wrote a conduct report against the plaintiff for battery, disobeying orders, and

9

disruptive conduct. Id. at ¶ 65. The plaintiff alleges that Perkins omitted certain relevant facts, like the fact that Benson had been allowed to go to his cell, come out with what appeared to be something under his shirt, and return to the dayroom. Id. at ¶ 66. On December 9, 2013, Don Morgan found the plaintiff guilty of fighting and disobeying orders. Id. at ¶ 67. Morgan sanctioned the plaintiff, requiring him to serve 180 days of disciplinary segregation. Id.

The plaintiff has since filed several written grievances with Warden Michael Meisner (who is not a defendant in the case), Deputy Warden Hautamaki (also not a defendant in the case), and Dittman regarding his health and safety at CCI. Id. at ¶¶ 69-71. On May 7, 2014, CCI Captain Keller responded to these grievances, stating that while the PRC (subsequent to a hearing) had approved the plaintiff's transfer to Waupun Correctional, someone—Keller doesn't say who—reviewed the plaintiff's concerns and separation needs, and decided that he could be housed at CCI "with a separation by complex." Id. at ¶ 72. The plaintiff alleged, as of the date of the complaint, that he "continues to have encounters with Alexander, Benson and others involved with that clique when in route to and from recreation, the library, the music room, the education building, Social Services department and the likes and have been threatened with a stabbing . . . ." Id. at ¶ 73.

The plaintiff has demanded a jury trial. Id. at ¶ 100. He asks the court for injunctive relief; he wants the court to order the defendants to expunge the offending conduct reports, to reinstate him to his "former custody status," to require the defendants to install an adequate ventilation system in the

10

segregation unit at OCI, and to implement a permanent keep-separate order to separate him from Alexander, Benson and "those affiliated with their clique." Id. at ¶¶ 101-104. The plaintiff also asks for compensatory damages of $300,000, and unspecified punitive damages. Id. at ¶ 106.

C.    Analysis of Alleged Facts

The plaintiff alleges four constitutional violations: (1) a First Amendment retaliation claim, (2) an Eighth Amendment claim of deliberate indifference to a known risk of substantial harm, (3) an Eighth Amendment failure-to-protect claim, and (4) a "class of one" equal protection claim under the Fourteenth Amendment.

1. *Retaliation*

To state a First Amendment claim for retaliation, the plaintiff must allege that: "(1) he engaged in an activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." Bridges v. Gilbert, 557 F.3d 541, 553 (7th Cir. 2009). (Citations omitted.)

In Count One of his complaint, the plaintiff alleges that Norman and Lieutenant Smith "retaliated" against him by placing him in segregation at OCI. But the plaintiff himself indicates that the reason Norman and Smith placed him in segregation was because they had information indicating that the plaintiff's fiancée was smuggling drugs into him, facilitating drug dealing in the institution. The First Amendment protects an inmate's free speech rights, not

11

his right to obtain drugs in prison. The plaintiff has alleged no facts in his complaint which support a claim that Norman or Lieutenant Smith retaliated against him for exercising his right to free speech.

In Count Two of the complaint, the plaintiff alleges that his security classification change, and his transfer to CCI, were retaliatory. But the facts the plaintiff alleges in the complaint indicate that he believes that he was re-classified, and subsequently transferred, because Norman, Lieutenant Smith and others determined that the plaintiff had not been "as candid and forthcoming" with assistance during the contraband smuggling investigation as the officers would have liked. Even if it were true that the plaintiff was reclassified and transferred because he wasn't honest about the contraband smuggling situation, that would not prove that he was reclassified and transferred in retaliation for exercising his *free speech* rights.

The plaintiff has not alleged anywhere in the complaint that he was placed in segregation, or reclassified, or transferred, in retaliation for something he said. The court will not allow the plaintiff to proceed on First Amendment retaliation claims.

2. *Eighth Amendment Claims*

To state a claim of cruel and unusual punishment under the Eighth Amendment, the plaintiff must allege that jail officials were "deliberately indifferent" to a substantial risk of serious harm to inmate health or safety. Farmer v. Brennan, 511 U.S. 825, 829, 834 (1994). Jail officials act with deliberate indifference when they know of a substantial risk of serious harm

12

and either act or fail to act in disregard of that risk. <u>Roe v. Elyea</u>, 631 F.3d 843, 857 (7th Cir. 2011). Prison officials must provide "human conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measure to guarantee the safety of the inmates.'" <u>Farmer</u>, 511 U.S. at 832.

Deliberate indifference requires "more than an ordinary lack of due care for the prisoner's interests or safety." <u>Whitely v. Albers</u>, 475 U.S. 312, 319 (1986). The prison official must "know of and disregard an excessive risk to inmate health or safety." <u>Del Raine v. Williford</u>, 32 F.3d 1024, 1032 (7th Cir. 1994). "[T]he official must both [have] be[en] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also [have] draw[n] the inference." <u>Id</u>. It is not enough that a reasonable prison official would or should have known that the prisoner is at risk; the official must actually know of and disregard the risk to incur culpability. <u>Farmer</u>, 511 U.S. at 837-38.

At various places throughout the complaint, the plaintiff alleges that Warden Smith, Dittman, Morgan, Keller, Norman, Lieutenant Smith, and Morrison were deliberately indifferent. His deliberate indifference claims fall into several different categories.

    a.  <u>Conditions of Confinement</u>

The plaintiff alleges that Norman and Lieutenant Smith, by putting him in segregation at OCI, subjected him to fluctuating temperatures. He states that he wrote an Interview Information Request to Lieutenant Smith, describing

13

the extreme cold and icy conditions, but alleges that Lieutenant Smith just told him to send the request slip to the unit supervisor, and did nothing about the temperatures. As a result, the plaintiff argues that he suffered numbing, pain, tingling sensations, and an inability to sleep for days at a time.

The plaintiff has alleged sufficient facts to allow him to proceed on an Eighth Amendment conditions of confinement claim against Lieutenant Smith; he has alleged that he notified Smith about the extreme cold in the unit, and that Smith did nothing. All the plaintiff has alleged with regard to Norman, however, is that Norman was involved in the decision to place the plaintiff in segregation. He makes no claim that he told Norman of the cold temperatures, or that Norman even had reason to know of them. The court will not allow the plaintiff to proceed on an Eighth Amendment conditions of confinement claim against Norman.

The plaintiff next alleges that in early January 2013, contaminated toilet water flooded his cell, soaking his shoes, socks and pants hems, and that he later contracted a fungal infection under the nail of his right big toe. He filed an inmate complaint on the matter and Warden Smith dismissed it without "any investigation." He asserts that he filed an inmate complaint, and that ICE Murphy (whom he didn't name as a defendant) recommended that Warden Smith dismiss that complaint. He alleges that Warden Smith should have conducted an independent investigation of the incident (citing to the Department of Corrections Administration Code), and he argues that Warden Smith "could have intervened in this matter by ensuring Officer Kraft and

14

Sergeant Borkowski received proper training to prevent flooding and pervasive contamination." Dkt. No. 1 at ¶ 39. He asserts that because she did not do that, Warden Smith "chose to be deliberately indifferent to the substantial risk of harm that resulted in [the plaintiff] submitting to the [OCI's] Health Service Unit personnel" a medical request for the fungal infection. Id.

The plaintiff has not stated a conditions-of-confinement claim against Warden Smith. The events he describes—the flooding of his cell—took place on January 1, 2013. It was not until a week later, on January 8, 2013, that ICE Murphy recommended that Warden Smith deny the complaint. There is no allegation that Warden Smith knew about the cell flooding until at least a week after it happened, and no allegation that she was in any way involved in the cell flooding.

The plaintiff's claim reads more like a failure-to-train claim. Generally, failure-to-train claims are brought against the government entities who employ, and are responsible for training, the individual defendants. See, e.g., Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978); City of Canton, Ohio v. Harris, 489 U.S. 378 (1989). In this case, the plaintiff has not sued the government entity which employs the staff who were on duty when the flooding occurred. More to the point, the plaintiff has not alleged any facts indicating that Warden Smith was responsible for training staff on how to prevent flooding, or that there even was any proper training on how to prevent flooding, or that this flooding could have been prevented. And while the plaintiff assumes that the toe fungus he reported two weeks after the flooding incident

15

was the result of the flooding incident, there are not facts to support that assumption. The court will not allow the plaintiff to proceed on conditions-of-confinement or failure-to-train claims against Warden Smith.

b. Failure to Protect

The plaintiff alleges that Lieutenant Smith, Warden Smith, Dittman, Weber, Morgan, Keller, Morrison, Perkins and Babcock failed to protect him from Michael Alexander, LeShawn Benson, and their associates.

The plaintiff first alleges that Lieutenant Smith served on the PRC at OCI, and played a part in recommending that the plaintiff's security classification be increased and that he be transferred to CCI. The plaintiff alleges that his "re-classification record" contained the CCI PRC's June 21, 2007 decision, indicating that the plaintiff had "some issues" with other inmates at CCI (although it appears that the decision did not explain what those "issues" were). He also alleges that the PRC—of which Lieutenant Smith was a member—assured him that Michael Alexander no longer was at CCI. The plaintiff says that he advised Lieutenant Smith and the PRC coordinator about the keep-separate order and the events that had led to its issuance.

At this early stage, the plaintiff has alleged sufficient facts to allow him to proceed on a failure-to-protect claim against Lieutenant Smith. He has alleged facts which imply that Lieutenant Smith was aware that there had been an incident at CCI which had resulted in both the plaintiff's transfer to another institution and the issuance of a keep-separate order regarding Michael Alexander, and yet the PRC (on which Lieutenant Smith served) ordered the

16

plaintiff's transfer back to CCI. While it is not clear what Smith may have known about the fact that Alexander was still at CCI, the court concludes that the plaintiff has alleged sufficient facts to allow him to proceed.

The plaintiff also has alleged sufficient facts to allow him to proceed on a failure-to-protect claim against Warden Smith. The plaintiff alleges that he notified three members of the OCI staff that he should not be transferred to CCI. It was Warden Smith who responded to these letters, indicating to the plaintiff that "there was no reason for a concern as the Alexander prisoner was no longer assigned at Columbia Correctional Institution." Dkt. No. 1 at ¶ 48. In fact, Alexander and his associates were housed at CCI when the plaintiff arrived. As he did with Lieutenant Smith, the plaintiff asserts that Warden Smith had knowledge of the 2007 SPN, and was aware that the plaintiff and Alexander's gang had been involved in a physical altercation at that time. While the plaintiff's assertions do not answer all the questions about what Warden Smith may or may not have known, the court concludes that he has alleged sufficient facts to allow him to proceed against Warden Smith.

The plaintiff has not alleged sufficient facts to allow him to proceed with his failure-to-protect claim against defendants Dittman, Weber, Morgan, Keller, and Morrison. The plaintiff alleges that beginning in February 2013, when he arrived at CCI, and continuing through November of 2013, he wrote to these defendants, telling them that when he had been in CCI in 2007, he had been in a fight with Alexander. Id. at ¶ 51. He also informed these defendants that Alexander was "affiliated" with a gang that once had tried to recruit the

17

plaintiff, that CCI inmate Leshawn Benson was a senior member of the gang, and that Benson had been threatening the plaintiff. Id. at ¶ 52. According to the plaintiff, these defendants conducted interviews with him and the "offending prisoner," but the result was that the rumors about the plaintiff having been a "snitch" at OCI increased. Id. at ¶ 53. As a result of the heightened threat, the plaintiff sent a request slip to Morrison, asking to be removed from his unit "before something happens." Id. at ¶ 54. Toward the end of November 2013 (the complaint says "[o]n or about 23, 2013," id. at ¶ 55; given the context, the court suspects the plaintiff meant to say "November 23, 2013), the plaintiff had a PRC hearing at CCI, where he asked, as a result of his safety concerns, for a lateral transfer. Id. at ¶ 55. The PRC concluded that there was no reason to transfer the plaintiff. Id. Later that day, the plaintiff was accosted in the dayroom by Lashawn Benson.

Contrary to the plaintiff's claims that Dittman, Weber, Morgan, Keller, and Morrison did nothing when he expressed his concerns to them, his own rendition of the facts indicates that these defendants actually conducted an investigation. They interviewed the plaintiff; he assumes they also interviewed either Alexander or Benson (he simply refers to the assumed interviewee as the "offending prisoner"), because the rumors about him being a snitch increased. While it is not entirely clear from the complaint, it appears that the plaintiff received a PRC hearing as a result of the complaints he made—perhaps, in particular, the complaint he made to Morrison on November 15, 2013, just eight days before the PRC hearing. The facts recounted by the plaintiff,

18

therefore, demonstrate that his complaints to Dittman, Weber, Morgan, Keller and Morrison resulted both in an investigation and a PRC hearing. Ultimately, the PRC decided there was no reason to transfer the plaintiff, but he makes no allegation that any of these defendants served on the PRC, or that they had anything to do with the PRC's decision to deny the plaintiff's request for a lateral transfer. The plaintiff may not proceed on failure-to-protect claims against these defendants.

The plaintiff also may proceed with his failure-to-protect claims against Perkins and Babcock. The plaintiff alleges that both Perkins and Babcock witnessed a verbal altercation between the plaintiff and Benson in the dining room. They then watched as Benson left the dining room and went to his cell. The plaintiff asserts that both Perkins and Babcock then observed Benson come back out of his cell (according to the plaintiff, contrary to DOC policy), with his hand under his sweatshirt and tucked into his pants. They observed him yelling obscenities in the plaintiff's direction, putting something on the officer's desk, and having words with another inmate. Despite observing all of these things, the plaintiff alleges that neither Perkins nor Babcock did anything to stop Benson from moving toward the plaintiff, and ultimately, injuring the plaintiff by punching him in the head and face and slamming him onto the table. The plaintiff assumes that Perkins and Babcock had been informed of the complaints he'd been making over the past eight or so months regarding his need to be separated from Alexander and his associates. Whether Perkins and Babcock knew of the plaintiff's concerns or not, the facts the plaintiff

19

asserts indicate that these two defendants certainly saw trouble brewing when Benson returned from his cell and went over to the plaintiff, yet they did nothing to stop the impending conflict. The court will allow the plaintiff to proceed on his failure-to-protect claim against Perkins and Babcock.

3. *Equal Protection*

The plaintiff lays out the case law regarding equal protection claims. "To state an equal protection claim, a §1983 plaintiff must allege that a state actor purposefully discriminated against him because of his identification with a particular (presumably historically disadvantaged) group." Sherwin Manor Nursing Center, Inc. v. McAuliffe, 37 F.3d 1216, 1220 (7th Cir. 1994). Generally, prisoners do not constitute a suspect class. Pryor v. Brennan, 914 F.2d 921, 923 (7th Cir. 1990). Plaintiffs may bring a "class of one" equal protection claim, however, without regard to protected-class status. Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000). The plaintiff must allege that he "has been intentionally treated differently from others similarly situated and . . . there is no rational basis for the difference in treatment." Id.

While the plaintiff describes the above law in his complaint, Dkt. No. 1 at ¶¶ 78-79, he alleges no facts in support of any claim that the defendants violated his rights under the Equal Protection Clause. He does not describe (1) how the defendants treated other inmates, (2) how the defendants treated the plaintiff, and, (3) how the treatment was different. He does not even identify which defendants he believes violated his equal protection rights. He simply asserts the law governing equal protection claims, and leaves it at that. Simply

stating the law is not sufficient for the court to allow the plaintiff to proceed in an equal protection claim against any of the defendants.

### III.    CONCLUSION

The court **GRANTS** the plaintiff's motion for leave to proceed *in forma pauperis*. Dkt. No. 2.  The court **ORDERS** the Secretary of the Wisconsin Department of Corrections or his designee to collect from the plaintiff's prison trust account the $**212.36** balance of the filing fee by collecting monthly payments from the plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the prisoner's trust account and forwarding payments to the Clerk of Court each time in the account exceeds $10, in accordance with 28 U.S.C. §1915(b)(2). The Secretary shall clearly identify the payments by the case name and number.

The court **ORDERS** that the plaintiff may proceed on an Eighth Amendment conditions-of-confinement claim against Lieutenant Smith, with regard to the alleged extremely cold conditions in his cell at OCI. The court also **ORDERS** that the plaintiff may proceed on an Eighth Amendment failure-to-protect claim against Lieutenant Smith and Warden Smith, as a result of their supporting and ordering his transfer to CCI despite his past history with Alexander and the 2007 keep-separate order. The court **ORDERS** that the plaintiff may proceed on an Eighth Amendment failure-to-protect claim against Perkins and Babcock, for their failure to prevent the incident between the plaintiff and Leshawn Benson at CCI.

21

The court **ORDERS** that defendants Eric Norman, Michael Dittman, Don Morgan, Security Director Weber, Captain Keller and Lieutenant Morrison are **DISMISSED** as defendants.

The court **ORDERS** that pursuant to the informal service agreement between the Wisconsin Department of Justice and this court, copies of the plaintiff's complaint and this order are being electronically sent today to the Wisconsin Department of Justice for service on defendants Judy Smith, Lt. R. Smith, Sgt. Perkins and Officer Babcock.

The court **ORDERS** that, pursuant to the informal service agreement between the Wisconsin Department of Justice and this court, defendants Warden Smith, Lt. Smith, Perkins and Babcock shall file a responsive pleading to the complaint within **sixty (60) days** of receiving electronic notice of this order.

The court further **ORDERS** that the plaintiff shall submit all correspondence and legal material to:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse
> 517 E. Wisconsin Avenue
> Milwaukee, Wisconsin 53202

PLEASE DO NOT MAIL ANYTHING DIRECTLY TO THE COURT'S CHAMBERS. It will only delay the processing of the matter. Because each filing will be electronically scanned and entered on the docket upon receipt by the clerk, the plaintiff need not mail copies to the defendants. All defendants

will be served electronically through the court's electronic case filing system. The plaintiff should also retain a personal copy of each document filed with the court.

The court further advises plaintiff that if he does not timely file documents, the court may dismiss his case for failure to prosecute.

In addition, the parties must notify the clerk of court of any change of address. Failure to do so could result in orders or other information not being timely delivered, thus affecting the legal rights of the parties.

The court will send a copy of this order to the warden of Racine Correctional Institution, where the plaintiff is currently incarcerated.

Dated in Milwaukee, Wisconsin this 1st day of June, 2016.

BY THE COURT:

HON. PAMELA PEPPER
United States District Judge

23