UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

CHAZ LAVER MOSEBY,

        Plaintiff,

v.

        Case No. 15-cv-1096-pp

JUDY SMITH, *et al.*,

        Defendants.

---

**DECISION AND ORDER GRANTING THE PLAINTIFF'S MOTION TO ACCEPT THE COMPLAINT AS A RESPONSE TO THE DEFNDANTS' MOTION FOR SUMMARY JUDGMENT AND PROPOSED FINDINGS OF FACT (DKT. NO. 36), GRANTING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 18), AND DISMISSING THE CASE**

---

The plaintiff Chaz Laver Moseby, a Wisconsin state prisoner who is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants violated his civil rights. Dkt. No. 1. The court screened the complaint under 28 U.S.C. §1915, and allowed the plaintiff to proceed with two Eighth Amendment claims: (1) a conditions-of-confinement claim against Rexford Smith ("Lieutenant Smith") for the cold temperatures in the segregation unit; and (2) a failure-to-protect claim against Rexford Smith, Judy Smith ("Warden Smith), Ronald Perkins and Melinda Babcock for their respective roles in placing him in close proximity to inmate Leshaun Benson. Dkt. No. 7. The defendants have filed a motion for summary judgment, dkt. no. 18, and the plaintiff has filed a motion asking the court to accept his *complaint* as a

1

response to the defendants' motion for summary judgment and proposed findings of fact, dkt. no. 36.

### I. THE PLAINTIFF'S MOTION TO ACCEPT THE COMPLAINT AS A RESPONSE TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PROPOSED FINDINGS OF FACT

The defendants filed their motion for summary judgment on November 23, 2016. Dkt. No. 18. The court's July 28, 2016 scheduling order gave the plaintiff thirty days to respond; he did not file a response by that date. As a result, on January 4, 2017, the defendants filed a motion to dismiss the case based on the plaintiff's failure to prosecute. Dkt. No. 29.

In response to the motion to dismiss, the plaintiff filed a motion to "suspend" the motion for summary judgment. Dkt. No. 31. He explained that he had been in and out of prison since filing his complaint on September 8, 2015, and that he did not have the time or the resources to properly litigate the case. Id. The court denied the plaintiff's motion, explaining that it was his responsibility to prosecute his case whether or not he was in custody, and that he had not updated his address to ensure that he received court filings (two separate court orders had already come back "undeliverable," see Dkt. Nos. 8 and 14). Dkt. No. 33. Nevertheless, the court denied the defendants' motion to dismiss, and gave the plaintiff a deadline of July 21, 2017 to file materials in opposition to the defendants' motion for summary judgment. Id.

On July 20, 2017, the plaintiff asked for an extension of time to file his response materials. Dkt. No. 34. The court granted the request, but warned the plaintiff that it would not grant any more extensions, in light of the fact that

the case had been pending since 2015 with no effort by the plaintiff to prosecute it. Dkt. No. 35. The court required the plaintiff to file his response materials on or before August 16, 2017. Id. Again, the plaintiff did not file his response by that deadline. Two days *after* the deadline—on August 18, 2017—the court received from the plaintiff a motion asking the court to construe his original complaint as his "response" to the defendants' motion for summary judgment and proposed findings of fact. Dkt. No. 36.

The Seventh Circuit instructed district courts to construe a sworn *pro se* complaint as an "affidavit" at the summary judgment stage. Ford v. Wilson, 90 F.3d 245, 246-47 (7th Cir. 1996). Accordingly, the court will grant the plaintiff's motion to accept his complaint as his response in opposition to the defendants' motion for summary judgment.

That being said—all this means is that, in opposition to the defendants' motion for summary judgment, supporting brief, proposed findings of fact, declarations and supporting exhibits (dkt. nos. 18 through 27), the court has a single document from the plaintiff—the twenty-page complaint he filed on September 8, 2015. Dkt. No. 1. That document includes a number of things that are not relevant in response to a motion for summary judgment—a jurisdictional statement, a venue statement, a "notice of claim statement," identification of the parties. The document also contains a number of assertions of facts outside the plaintiff's personal knowledge.

Under Fed. R. Civ. P. 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." In other words, the plaintiff must have seen, heard or participated in the facts that he alleges to be true. In ruling on the motion for summary judgment, therefore, the court will consider only those portions of the complaint that are based on the plaintiff's personal knowledge; the court will not consider unsubstantiated facts or conclusory allegations.

## II. THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

A.  Facts[1]

The plaintiff is a former Department of Corrections ("DOC") inmate. Dkt. No. 1. The defendants are, or were, DOC employees: Judy Smith currently is Warden of Oshkosh Correctional Institution ("OCI"); Rexford Smith was a lieutenant at OCI; Ronald Perkins and Melinda Babcock were correctional sergeants at Columbia Correctional Institution ("CCI"). Dkt. No. 21 at ¶¶ 1-5.

Sometime in October 2012, the plaintiff received a conduct report at OCI, because prison staff believed that the plaintiff's fiancée, Marie Enzell, planned to smuggle drugs into the prison during her October 13, 2012 visit. Dkt. No. 1 at ¶¶ 8-11. Lieutenant Smith and a different officer removed the plaintiff from

---

[1] The court takes facts in this section from the defendants' Proposed Findings of Fact, dkt. no. 21, and the plaintiff's sworn complaint, dkt. no. 1. Where the plaintiff's factual allegations dispute the defendants' proposed findings of fact without evidentiary support, those facts are deemed admitted for the purpose of deciding summary judgment. Civ. L. R. 56(b)(4).

4

the general population on that date, and placed him Temporary Lock-Up ("TLU"). Id. at ¶ 12; see also Dkt. No. 21 at ¶¶ 43- 44. Later that day, prison staff intercepted Enzell in the lobby of OCI with marijuana and K2. Dkt. No. 1 at ¶ 13.

The plaintiff had his disciplinary hearing for the conduct report on October 22, 2012. Dkt. No. 21 at ¶ 46. The hearing officer found the plaintiff guilty of "enterprises and fraud" and attempted "possession of intoxicants." Id. He referred the matter to the Program Review Committee ("PRC")[2] to re-evaluate the plaintiff's security classification, because drug trafficking is a serious offense in prison. Id. at ¶45.

The plaintiff appealed the hearing officer's decision and asserted, among other things, that he did not receive "notice" prior to placement in TLU. Id. at ¶47. The deputy warden affirmed the hearing officer's decision, and noted that Lieutenant Smith had completed a "TLU notice" for the plaintiff on October 13, 2012. Id. at ¶48. The plaintiff had "no comment," refused to sign the TLU notice document, and there were no other procedural errors. Id.

On November 15, 2012, the plaintiff appeared before the PRC for his security re-classification hearing. Id. at ¶49. Lieutenant Smith and two other OCI staff members served as members of the PRC. Id. at ¶50. Warden Smith

---

[2] The PRC is a review committee comprised of institution staff. Dkt. No. 21 at ¶ 53. It can increase, reduce or maintain an inmate's security classification based on disciplinary offenses. Id.

5

was not a member of the PRC, and had no role in the re-classification process.[3] Id. at ¶61.

The PRC considered the plaintiff's conduct report, his personal statement, and his pending special placement needs restrictions ("SPN restrictions"). Id. at ¶55. An SPN restriction is used to physically separate inmates who have pending issues with staff, other inmates or particular facilities. Id. at¶57. The plaintiff had an active SPN restriction at the Waupun Correctional Institution ("WCI"). Id. at ¶56. The plaintiff had an "inactive" SPN restriction at Columbia Correctional Institution for separation from inmate Michael A. Alexander. Id. at ¶¶56-58. According to the complaint, the plaintiff was the target of a gang assault in 2007, which "resulted in a physical altercation with Michael Alexander, another prisoner, who tried to recruit Moseby, then 22 years old, into a prison gang." Dkt. No. 1 at ¶42. As of July 30, 2008, however, the SPN at CCI was no longer in effect. Dkt. No. 21 at ¶58.

The PRC unanimously recommended elevating the plaintiff's custody status from medium security to maximum security with transfer to CCI. Id. at ¶55. The plaintiff expressed concerns regarding his transfer to CCI, and regarding the prior SPN involving inmate Alexander. Dkt. No. 1 at ¶48. The PRC allegedly assured him that inmate Alexander was no longer incarcerated at CCI. Id.

---

[3] The Warden is not involved in the reclassification process unless there is a split within the PRC on how to proceed. Dkt. No. 21 at ¶¶53-55, 60-61. The PRC's recommendation in this case was unanimous. Id. at ¶55.

6

The plaintiff remained in the restrictive housing unit at OCI until February 5, 2013. Id. at ¶23. According to the plaintiff, the restrictive housing unit had insufficient insulation and ventilation. Id. at ¶12. The inmates housed there experienced "extreme fluctuating temperatures" and "extremely cold temperatures." Id. The plaintiff complained to "Defendant Smith" about the cold temperatures, id., but it is unclear from the complaint whether "Defendant Smith" refers to Lieutenant Smith or Warden Smith. See id. at ¶¶12, 20.

Neither Lieutenant Smith nor Warden Smith recall receiving a request slip from the plaintiff regarding cold temperatures. Dkt. No. 21 at ¶¶17, 22. Lieutenant Smith explains that he was not assigned to the restrictive housing unit while the plaintiff was housed there. Id. at ¶14. If the plaintiff had sent him a request slip involving the restrictive housing unit, he would have directed the plaintiff to write to the restrictive housing supervisor, who is responsible for complaints regarding the restrictive housing unit. Id. at ¶18. Warden Smith similarly explains that if she had received a request slip from the plaintiff, she would have recommended that the plaintiff send the request to the restrictive housing supervisor. Id. at ¶24.

Sean McWane, the HVAC/refrigeration specialist at OCI, states that between October 2012 and February 2013, the pre-set temperature for the restrictive housing unit was 71 degrees. Id. at ¶30. McWane receives an alarm/notification on his office computer if the temperature in any building at OCI drops below 68 degrees or above 79 degrees. Id. at ¶29. He usually checks the computer every morning to ensure that temperatures are within the normal

7

range. Id. at ¶31. McWane does not recall any alarm/notification between October 12, 2012 and February 13, 2013. Id. at ¶39. Further, between October 2012 and February 2013, McWane received only one work order request for heat-related issues in an individual cell. Id. at ¶¶34-39. McWane followed up, and determined that the temperature was within the standard operating range. Id. at ¶36.

On February 7, 2013, the plaintiff arrived at CCI. Dkt. No. 1 at ¶50. The plaintiff saw inmate Alexander and "a number of other prisoners from Alexander's clique," and the "animosity" from 2007 resumed. Id. In November 2013, the plaintiff wrote a request slip asking to be removed from his current unit "before something happens," because he believed that "hostility [was] becoming more and more immediate." Id. at ¶54. On November 23, 2013, the PRC at CCI held a hearing, where the plaintiff verbally expressed his concern and asked to be transferred to a different maximum-security facility. Id. at ¶55. The PRC decided that there was no need to transfer the plaintiff. Id.

On that same day—November 23, 2013—the plaintiff and inmate Leshaun Benson had an altercation. The parties' explanations of what happened differ only slightly. According to the plaintiff, Benson verbally assaulted the plaintiff in the dining room, calling him a "snitch" for having asked to be moved to a different prison. Dkt. No. 1 at ¶56. Benson stormed off toward his cell. Id. at ¶57. Benson came back into the dayroom, shouted obscenities at the plaintiff, put something on the officer's desk (which he had concealed in his waistband of his pants), spoke briefly to another prisoner, and

8

went over to where the plaintiff was sitting. Id. at ¶63. The plaintiff stood up and "subdued Benson in a headlock and refused to release Benson until staff restrained Benson." Id. at ¶64. Before the staff was able to restrain Benson, Benson punched the plaintiff in the head and face and injured the plaintiff's back by slamming him on the table. Id.

According to the defendants, the plaintiff and Benson engaged in a mutual verbal altercation during the evening meal. Id. at ¶67. Perkins observed from the officer's station, and Babcock was working the "control center."[4] Dkt. No. 21 at ¶¶63-64. Perkins notified Babcock of the brewing verbal altercation, and Babcock watched from the control center as Perkins ordered both inmates to stop arguing. Id. at ¶68. Benson asked to return to his cell, and did so. Id. Benson then left his cell to approach the officer's station. Id. at ¶70. Perkins could see Benson's hands and body, and Benson did not have anything in his hands or in the waistband of his pants. Id. at ¶71. The plaintiff then stood up from the table and approached Benson with raised fists. Id. at ¶70. Perkins ordered both inmates to "lock" into their cells. Id. at ¶72. Both inmates disobeyed the order, and began fighting. Id. Perkins ordered the inmates to stop fighting several more times, and called for additional assistance. Id. at ¶¶74-76. Babcock remained in the control center and opened unit doors once other officers arrived. Id. at ¶¶78-80.

---

[4] The control center opens and unlocks individual cell doors and larger unit doors and must be staffed at all times while inmates are on the unit. Dkt. No. 21 at ¶69.

9

The officers restrained both inmates, and both were sent to Temporary Lock-Up. Id. at ¶¶78-79. About two months later, on January 30, 2014, the plaintiff requested an SPN restriction for separation from inmate Benson; prison staff approved it on the same day. Id. at ¶90. Prior to the altercation on November 23, 2013, the plaintiff never had notified Perkins or Babcock that he needed protection from inmate Benson. Id. at ¶¶84-85.

B. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(c); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). The movant (in this case, the defendants) bears the burden of establishing that there are no genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets this burden, the non-movant (in this case, plaintiff Moseby) must designate specific facts that establish that there is a genuine triable fact. Fed. R. Civ. P. 56(e). The court grants summary judgment when no reasonable jury could find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

C. Section 1983

To prevail on a claim under §1983, the plaintiff must establish that: (1) he was deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was visited upon him by a person or persons

10

acting under the color of state law. Buchanan-Moore v. C'nty of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009) (citing Kramer v. Village of N. Fond du Lac, 384 F.3d 856, 861 (7th Cir. 2004).

1. *Eighth Amendment: conditions of confinement*

Prison conditions can constitute cruel and unusual punishment under the Eighth Amendment if the conditions are so severe that they deny an inmate "the minimal civilized measure of life's necessities." Hudson v. McMillian, 503 U.S. 1, 20 (1992); Gillis v. Litscher, 468 F.3d 488, 491 (7th Cir. 2006). The plaintiff must show that: (1) the prison conditions were serious enough to deny him basic human needs; and (2) the officers acted with a culpable state of mind. McNeil v. Lane, 16 F.3d 123, 124 (7th Cir. 1993). In claims involving prison temperature, "[the plaintiff] must provide evidence showing that the temperature of the cell in which he was confined was excessively cold, or that he was exposed to extremely cold temperatures for an extended amount of time." Gay v. Chandra, 652 F. Supp. 2d 959, 969 (S.D. Ill. 2009).

The plaintiff has not designated sufficient facts to demonstrate that there is a genuine dispute as to an issue of material fact on his allegation that the temperature in his cell constituted cruel and unusual punishment. Although the plaintiff alleges that Lieutenant Smith exposed him to "extreme fluctuating temperatures" and "extremely cold temperatures" in the restrictive housing unit, no reasonable jury could arrive at that conclusion based on the evidence on the record. See Smith v. Roper, 12 F. App'x 393, 397 (7th Cir. 2001)

11

(concluding that the defendants can offer evidence to rebut the plaintiff's allegations regarding the temperature in a cell).

The defendants' evidence shows that the average temperature in the restrictive housing unit between October 2012 and February 2013 was 71 degrees. A temperature of 71 degrees is not "extremely cold;" even if the plaintiff considered that temperature cool, or chilly, that would not be sufficient to demonstrate that the plaintiff was denied basic human needs. See Bowers v. Pollard, 602 F. Supp. 2d 977, 988 (E.D. Wis.), aff'd, 345 F. App'x 191 (7th Cir. 2009) (concluding that an individual cell heated to 70 degrees could not serve as the basis for a conditions-of-confinement claim).

OCI's HVAC specialist attested to the fact that he receives a notification on his office computer anytime temperatures in any building in OCI drop below 69 degrees. He checks for notifications every morning, and he attested that he did not receive any notifications between October 2012 and February 2013. He also attested to the fact that he had only one work order request to check an individual cell during that period, and he discovered that the temperature in that individual cell was also within normal operating ranges. Against this evidence, the court has only the plaintiff's bare assertion that he was subjected to "fluctuating" temperatures and "extremely cold" temperatures. That is not enough to raise a genuine dispute as to the material issue of whether the temperatures in his cell deprived him of basic human needs.

Even more to the point, Lieutenant Smith did not work in the restrictive housing unit at the time plaintiff was housed there, and he does not recall

12

receiving any request slips from the plaintiff regarding cold temperatures. If the plaintiff had sent Lieutenant Smith a request slip, Smith would have told the plaintiff to write to the restrictive housing supervisor, who is responsible for addressing complaints involving the restrictive housing unit. Nor does Warden Smith recall getting any such complaints from the plaintiff; if she had, she, too, would have told the plaintiff to write to the restrictive housing supervisor.

The plaintiff's allegations against Lieutenant Smith and Warden Smith amount to a claim that they had a responsibility to do the job of the HVAC specialist, or the restrictive housing supervisor. This is not the case. "Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job." Burks v. Raemisch, 555 F.3d 592, 595 (7th Cir. 2009).

In short, the plaintiff has not submitted competent evidence showing that there is a genuine dispute as to the question of whether the temperature in his cell deprived him of a basic human need, nor has he submitted facts to demonstrate that he complained to either of the Smith defendants—Lieutenant Smith or Warden Smith—about the temperature in his cell. Finally, he has not demonstrated as a matter of law that either Lieutenant Smith or Warden Smith were the appropriate parties to address any issues the plaintiff may have had with the temperature in his cell. For all of these reasons, the court will grant summary judgment in favor of the defendants on the plaintiff's conditions-of-confinement claim.

## 2. *Eighth Amendment: failure to protect*

To prevail on a failure-to-protect claim, the plaintiff must establish that the defendants knew of a substantial risk of serious harm to inmate safety and that they intentionally disregarded that risk. Farmer v. Brennan, 511 U.S. 825, 834, 837 (1994)). Although correctional officers are responsible for protecting inmates from one another, not every harm caused by another inmate translates into constitutional liability. Id. at 834. Correctional officers are liable only where they are aware of a specific, impending and substantial threat to inmate safety. Pope v. Shafer, 86 F.3d 90, 92 (7th Cir. 1996). "A generalized risk of violence is not enough, for prisons are inherently dangerous places." Wilson v. Ryker, 451 F. App'x 588, 589 (7th Cir. 2011) (citing Brown v. Budz, 398 F.3d 904, 909, 913 (7th Cir. 2005)); see also Riccardo v. Rausch, 375 F.3d 521, 525 (7th Cir. 2004).

### a. Defendants Lieutenant Smith and Warden Smith

The plaintiff's failure-to-protect claim against Lieutenant Smith and Warden Smith stems from their knowledge that the plaintiff had an inactive SPN at CCI for separation from inmate Alexander. The plaintiff ultimately did not have any issues with inmate Alexander while at CCI. Instead, he had an altercation with inmate Benson, whom he alleges was in the same "clique" as inmate Alexander. Lieutenant Smith and Warden Smith may have been aware of a generalized risk of violence at CCI given the SPN from 2007, but the plaintiff has presented or identified no evidence on the record showing that they were aware of a specific, impending and substantial threat to the

14

plaintiff's safety *from inmate Benson*. Without that evidence, the court grants summary judgment in favor of both Smith defendants on the plaintiff's failure-to-protect claim.

      b.     Defendants Perkins and Babcock

The plaintiff has presented no specific evidence to rebut the defendants' evidence that the plaintiff never notified Perkins or Babcock that inmate Benson posed a specific, pending and substantial risk to his safety. Perkins notes that he often saw the plaintiff and inmate Benson play cards at the same table. Both defendants attest to the fact that *the plaintiff* was the first between the two to react physically, approaching inmate Benson with raised fists. Their assertions are consistent with the plaintiff's own admission that he stood up and "subdued Benson in a headlock and refused to release Benson until staff restrained Benson." Dkt. No. 1 at ¶64. Based on this record, no reasonable jury could conclude that Perkins and Babcock knew that Benson posed a specific, pending and substantial risk to the plaintiff's safety or that they intentionally disregarded that risk. The court will grant summary judgment in favor of defendants Perkins and Babcock on the failure-to-protect claim.

### III.   CONCLUSION

The court **GRANTS** the plaintiff's motion for order accepting the plaintiff's complaint as a response to the defendants' motion for summary judgment and proposed findings of fact. Dkt. No. 36. The court **ACCEPTS** the plaintiff's complaint, which it construes as an affidavit, as his response to the defendants' motion for summary judgment and supporting documents.

15

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 18.

The court **ORDERS** that this case is **DISMISSED**. The clerk of court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Fed. R. App. P. 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. P. 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e), or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend either deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and

determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 6th day of September, 2017.

BY THE COURT:

_____
**HON. PAMELA PEPPER**
**United States District Judge**